1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOE NINO,

               Plaintiff,

     v.

J. MUNOZ, et al.,

               Defendants.

Case No. 1:20-cv-01722-ADA-CDB (PC)

**FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANT SULLIVAN'S MOTION TO DISMISS**

(Doc. 48)

**14-DAY OBJECTON DEADLINE**

Plaintiff Joe Nino, appearing through counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983.

## I.      BRIEF PROCEDURAL BACKGROUND

On June 21, 2022, the previously assigned magistrate judge issued an Order Finding Service of Third Amended Complaint Appropriate and Directing Service. (Doc. 34.) Specifically, the Court directed that Defendants Carrillo, Escarcega, Harris, Masferrer, Munoz, and Sullivan be served. (*Id.* at 2.)

On August 22, 2022, Defendant Sullivan filed a motion to dismiss Plaintiff's third amended complaint. (Doc. 38.) That same date, Defendants Carrillo, Escarcega, Harris, Masferrer and Munoz filed an answer to the third amended complaint. (Doc. 39.)

//

1    On September 12, 2022, Plaintiff filed an opposition to Sullivan's motion to dismiss (Doc.

2    41) and Sullivan replied on September 26, 2022 (Doc. 42).

3    On October 6, 2022, this action was reassigned to the undersigned as magistrate judge.

4    (Doc. 43.)

5    On February 21, 2023, the Court issued Findings and Recommendations to Grant in Part

6    and Deny in Part Defendant Sullivan's Motion to Dismiss. (Doc. 44.) Specifically, the Court

7    found Plaintiff failed to allege sufficient facts to state a claim for supervisory liability against

8    Defendant Sullivan. (*Id*. at 12-18.) The Court recommended Defendant Sullivan's motion be

9    granted in part and denied in part, allowing Plaintiff a final opportunity to amend his complaint

10   concerning his cause of action against Defendant Sullivan. (*Id*. at 18-19.)

11   On June 1, 2023, District Judge Ana de Alba issued her Order Adopting Findings and

12   Recommendations to Grant in Part and Deny in Part Defendant Sullivan's Motion to Dismiss.

13   (Doc. 45.) Plaintiff was directed to file his fourth amended complaint within 30 days. (*Id*. at 2.)

14   Plaintiff filed a fourth amended complaint on June 30, 2023. (Doc. 46.)

15   On July 13, 2023, Defendants Carrillo, Escarcega, Harris, Masferrer and Munoz filed an

16   answer to the fourth amended complaint. (Doc. 47.) That same date, Defendant Sullivan filed a

17   Motion to Dismiss Plaintiff's Fourth Amended Complaint. (Doc. 48.) Plaintiff filed an opposition

18   (Doc. 49) and Defendant replied thereto (Doc. 50).

19   Defendant Sullivan's motion to dismiss is fully briefed and has been assigned to this

20   Court for findings and recommendations.

21   **II.    LEGAL STANDARDS**

22   **Motions to Dismiss**

23   A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro*

24   *v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). In resolving a 12(b)(6) motion, the Court's review is

25   generally limited to the "allegations contained in the pleadings, exhibits attached to the complaint,

26   and matters properly subject to judicial notice." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

27   F.3d 1025, 1030-31 (9th Cir. 2008) (internal quotation marks & citations omitted). Dismissal is

28   proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged

2

1    under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

2    1988) (citation omitted).

3        "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

4    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

5    U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In order to

6    survive dismissal for failure to state a claim, a complaint must contain more than a "formulaic

7    recitation of the elements of a cause of action;" it must contain factual allegations sufficient to

8    "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The pleading

9    must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a

10   legally cognizable right of action." *Id*.

11       The Court "accept[s] as true all well-pleaded allegations of material fact, and construe[s]

12   them in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

13   F.3d 992, 998 (9th Cir. 2010) (citation omitted). A motion to dismiss for failure to state a claim

14   should not be granted unless it is "clear" that plaintiff can prove no set of facts in support of the

15   claim that would entitle him to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)

16   (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). To the extent the plaintiff can cure deficient

17   pleadings by alleging additional facts, leave to amend should be granted. *Cook, Perkiss and*

18   *Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations

19   omitted).

20                              **Section 1983 Claims**

21       An individual may bring an action for the deprivation of civil rights pursuant to 42 U.S.C.

22   § 1983 ("Section 1983"), which "is a method for vindicating federal rights elsewhere conferred."

23   *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

24           Every person who, under color of any statute, ordinance, regulation,
             custom, or usage, of any State or Territory... subjects, or causes to be
25           subjected, any citizen of the United States or other person within the
             jurisdiction thereof to the deprivation of any rights, privileges, or
26           immunities secured by the Constitution and laws, shall be liable to
             the party injured in an action at law, suit in equity, or other proper
27           proceeding for redress...

28

                                      3

42 U.S.C. § 1983. To state a cognizable claim under Section 1983, a plaintiff must allege (1) the deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976). A plaintiff must allege a specific injury was suffered and show causal relationship between the defendants' conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). Thus, Section 1983 "requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff." *Chavira v. Ruth*, No. 1:11-cv-01718-MJS (PC), 2012 WL 1328636, at *2 (E.D. Cal. Apr. 17, 2012). A person deprives another of a constitutional right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

**Supervisory Personnel**

Liability may not be imposed on supervisory personnel under Section 1983 based on the theory of *respondeat superior*, as each defendant is only liable for his or her own misconduct. *Iqbal*, 556 U.S. at 1948-49; *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009). When a defendant holds a supervisory position, the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). A plaintiff must allege facts sufficient to determine that the supervisory official "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("a plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates"); *see also Anderson v. Hansen*, No. 1:09-cv-01924-LJO-MJS (PC), 2013 WL 4676212, at *3 (E.D. Cal. Aug. 30, 2013) ("[a] prison official may be held liable for failing to protect an inmate from a prison guard if he knew of an excessive risk to inmate health or safety posed by the … prison guard and disregarded that risk"), adopted by 2013 WL 5183687 (E.D. Cal. Sept. 13, 2013), reconsideration denied,

4

1  2013 WL 6070044 (E.D. Cal. Nov. 14, 2013). Claims of the general responsibility of the warden

2  for prison operations "are insufficient to establish Section 1983 liability." *Brown v. Perez*, No.

3  EDCV 14-2421-CJC (JEM), 2016 WL 7975264, at *6 (C.D. Cal. Dec. 16, 2016), adopted by

4  2017 WL 354168 (C.D. Cal. Jan. 24, 2017).

5  **III.    PLAINTIFF'S CLAIM AGAINST DEFENDANT SULLIVAN**

6        The Court focuses on the third cause of action from Plaintiff's fourth amended complaint,

7  asserting an Eighth Amendment claim against Defendant Sullivan alone. (*See* Doc. 46 at 17-22.)

8  Plaintiff's factual recitations (*id*. at 4-11) do not involve Defendant Sullivan; thus, the Court

9  elects to forego their recitation here.[1] The third cause of action states, in relevant part:

10          68. Defendant Warden W.J. Sullivan violated Plaintiff's right to be
11  free from cruel and unusual punishment guaranteed to him by the
   Eight [*sic*] Amendment to the United States Constitution by his
12  failure to adequately train custody staff in the appropriate use of force
   and criminal activity; and by his failure to supervise the other
13  Defendants and by his failure to investigate the incident or discipline
   the other defendants.

14          69. Plaintiff's claims against Defendant Sullivan are based on his
   maintaining and permitting the practices, policies and customs under
15  CDCR guidelines and procedures for correctional facilities. In
   addition, Defendant Sullivan was responsible for the supervision,
16  training and hiring of persons and employees working within CCI
   Tehachapi including correctional officers, medical staff, mental
17  health staff and other employees within the CCI facility. In
   particular, Plaintiff is informed and believes and based thereon
18  alleges that Defendant Sullivan, as the official policy maker for CCI
   Tehachapi, was aware of widespread beatings and use of excessive
19  force in CCI Tehachapi.

20          70. Specifically, and on information and belief, Defendant Sullivan
   had actual notice of the widespread beatings at CCI through several
21  sources. Defendant Sullivan was CCI's hiring authority who is
   required to impose discipline on those correctional officers that
22  served below him. In his supervisory capacity and role as Warden,
   Sullivan was required to review, and did review, a multitude of
23  inmate incident documentation related to abuses against CCI inmates
   and the use of excessive force against those inmates by CCI
24  correctional officers: inmate incident reports, 602 grievances, use of
   force reviews and reports under Title 15, medical reports, emergency
25  room data, Office of Internal Affairs investigations into CDCR
   personnel misconduct, and OIG reports. In particular, Defendant
26  Sullivan was keenly aware of the systemic abuse and violence of his

27  _____

28  [1] In its February 2023 Findings and Recommendations concerning Sullivan's prior motion to dismiss, the Court recited Plaintiff's factual allegations. (*See* Doc. 44 at 4-7.) To the extent specific factual allegations are necessary to the Court's determination here, they will be referenced and cited accordingly.

subordinate officers at CCI because the July 2018 OIG Report entitled "Monitoring the Use of Force," made it abundantly clear that those systematic abuses of inmates by the CCI correctional officers and assaults against inmates at that facility remained widespread, continuous and sometimes deadly.

71. The July 2018 OIG Report, which was based upon data throughout the entire CDCR system between July 1, 2017, and December 31, 2017, specially identified 3,709 use of force incidents in that six-month period. Those 3,709 incidents involved 11,046 "applications of force" (baton beatings, use of chemical agents, physical holds, less-lethal projectiles, tasers and firearms. Forty-eight percent (48%) of the 3,709 use of force incidents were found to violate CDCR departmental policies (1,774 incidents). The OIG Report revealed that 38 use of force incidents occurred during that six-month period at one of CCI's facilities alone (Facility A), second highest number behind Cal State Prison, Sacramento. In July 2017, CDCR implemented its officer training program for correctional officers and staff known as multiple interactive learning objective (MILO) simulator designed to educate and train officers to counter the escalating occurrences of abuse and excessive force against inmates, was deployed with mixed results. Defendant Sullivan, aware of the increasing dangers his officers posed to the CCI inmates, failed to adequately embrace the training modules and took no steps to curtail the pervasive beating incidents, up to at least December 31, 2018, then again on July 29, 2019, when Plaintiff was senselessly beaten by the named Individual Defendants herein. Because Defendant Sullivan was aware of the ongoing excessive use of force incidents due to, and the result of, his role of being in charge and his duty to read all of the above referenced materials, he was on actual notice, or at least constructive notice, of the CCI officers' abuses which permeated the facility. Defendant Sullivan was particularly knowledgeable and aware of Defendant F. Harris' propensity to violate CDCR departmental policy due to Harris' involvement in several excessive [use] of force incidents which resulted in significant injuries to inmates and legal and financial repercussions to the State of California. Defendant Sullivan's inaction allowed Harris to act with impunity.

72. Instead of taking proper steps to discipline Individual Defendants and named Doe Defendants, Defendant Sullivan condoned, encouraged, fostered and/or ratified the unlawful conduct of said Defendants. Plaintiff is further informed and believes and thereon alleges that Defendant Sullivan ratified the Individual Defendants and Doe Defendants' unconstitutional conduct towards Plaintiff. Defendant Sullivan is sued in official supervisory capacity for his own culpable action or inaction in the training, supervision or control of his subordinates, or for his acquiescence in the constitutional deprivations which this amended Complaint alleges, or for the conduct that showed a reckless or callous indifference to the rights of others.

73. Defendant Sullivan acted under color of state law, and he knew or should have known that his conduct, attitude and actions, or lack thereof, created an unreasonable risk of serious harm to Plaintiff.

Despite this knowledge, Defendant Sullivan failed to take reasonable steps to protect Plaintiff and to ensure his constitutional right to be free from cruel and unusual punishment while he was in Defendants' care and custody at Tehachapi.

74. The actions and conduct of Defendant Sullivan demonstrate deliberate indifference to Plaintiff's well-being and constitutes violations of Plaintiff's Eight [*sic*] Amendment rights under the United States Constitution.

75. As a proximate result of the Defendants' failure to ensure Plaintiff's right to be free from cruel and unusual punishment while incarcerated at Tehachapi, Plaintiff has suffered, is suffering, and will continue to suffer irreparable harm.

76. As a direct and foreseeable result of the Defendants' violations of Plaintiff's Eight [*sic*] Amendment rights, Plaintiff has suffered, is suffering and will continue to suffer physical injuries in the form of damage to his left eye, loss of eyesight, headaches, problems with balance, and other injuries.

77. As a direct and foreseeable result of the Defendants' violations of Plaintiff's Eighth Amendment rights, Plaintiff has suffered, is suffering and will continue to suffer injuries in the form of pain and suffering, shame, humiliation, degradation, emotional distress, embarrassment, mental distress and other injuries.

(Doc. 46 at 17-22.)

## IV.    DISCUSSION

The Court sets forth the parties' positions before moving to an analysis of Defendant's motion.

### Defendant Sullivan's Motion (Doc. 48)

Defendant contends Plaintiff's fourth amended complaint suffers the same problems his third amended complaint suffered; that is, it fails to plead facts regarding policies, practices, and customs that Defendant promulgated, fails to plead facts regarding Defendant's training and hiring of subordinates, and fails to plead any facts to show that Defendant acquiesced to or condoned the alleged unconstitutional conduct of subordinates. Further, Defendant asserts he is entitled to qualified immunity.

Specifically, Defendant argues Plaintiff's allegations regarding policies, practices, and customs Defendant purportedly promulgated are conclusory and lack any supporting facts. Thus, the allegations are insufficient to state a claim. Moreover, Plaintiff fails to plead "any facts at all

1 regarding how Sullivan conducted training, or how the training is related to Plaintiff's injury,

2 making the allegation insufficient to state a claim."

3      Defendant argues the only new allegations in Plaintiff's fourth amended complaint are

4 found in paragraphs 70 and 71. Defendant notes Plaintiff's assertions he "reviewed a 'multitude'

5 of documents (inmate incident reports, 602 grievances, etc.)" and a July 2018 OIG report, that he

6 "'failed to adequately embrace' CDCR's multiple interactive learning objection (MILO)

7 training," and that Defendant "'was particularly knowledgeable and aware of Defendant F.

8 Harris' propensity to violate CDCR departmental policy due to Harris' involvement in several

9 excessive sue [sic] of force incidents.'" Defendant argues Plaintiff has failed to state a claim

10 because Plaintiff did not specifically identify any incidents to support the legal conclusion

11 Defendant reviewed multiple documents concerning inmate incidents, grievances, or emergency

12 room data. The allegations do not "specifically identify any incident, when the incident happened,

13 and when Sullivan knew about it, or what his response was." Therefore, Defendant argues the

14 allegations do not show he had the required knowledge, or that he condoned any unconstitutional

15 conduct.

16      Defendant alleges Plaintiff's assertions regarding the July 2018 OIG report also fail. He

17 contends the report does not show any "'systemic abuse'" because the 3,709 use of force

18 incidents between July and December 2017, of which 38 occurred in Facility A at CCI, do "not

19 state that any of those incidents involved excessive force, let alone abuse." Nor does the report's

20 finding that "'forty-eight percent (48%) of the 3,709 use of force incidents [throughout CDCR]

21 were found to violate CDCR departmental policies'" equate to a showing that inmates were

22 abused or that excessive force was used. Additionally, the report's reference to forty-eight percent

23 does not refer to CCI specifically. Defendant contends Plaintiff's fourth amended complaint

24 "does not specifically identify any incident of excessive force at CCI, when the incident

25 happened, when Sullivan knew about it, or what his response was."

26      Defendant contends "Plaintiff's mention of the OIG report is an apparent attempt to mimic

27 the complaint in *Starr v. Baca*." In *Starr*, defendant Baca "received a 'findings letter' from the

28 Department of Justice detailing a 'continued and serious pattern and practice of constitutional

violations including abuse of inmates by sheriff's deputies' at the jail." Unlike the findings letter at issue in *Starr*, the "July 2018 OIG report did not state that inmates' constitutional rights had been violated or that there was a pattern of abuse at CCI." Further, Defendant argues that in *Starr* there was more involved than the findings letter alone. In *Starr*, a memorandum of understanding with the Department of Justice required Baca and the county to correct continuous violations, reports from special counsel to the sheriff's office found inmate abuse and increasing levels of inmate violence, and ten specific instances of violence against inmates leading up to the incident involving Starr, were also at issue. Defendant argues no such allegations were made here.

Next, Defendant contends Plaintiff's assertion that he knew of Defendant "Harris' 'propensity to violate CDCR departmental policy'" is flawed because the fourth amended complaint pleads no facts showing any specific incidents involving Harris, when they happened, when Sullivan knew about the incidents, or how he may have responded. Defendant argues it is "simply speculat[ion] that Sullivan must be at fault because he was the warden," and thus, Plaintiff fails to state a claim.

Defendant maintains Plaintiff's assertion that Defendant failed to "'adequately embrace the [MILO] training modules'" falls short because the "'failed to embrace' statement is simply a vague, legally meaningless conclusion without any factual support." Defendant asserts Plaintiff has alleged no facts as to Defendant's training, nor any facts connecting his conduct to Plaintiff.

Further, Defendant contends Plaintiff's allegations do not connect Defendant to Plaintiff's alleged harm. He states there "is no allegation of any action or failure to act by Sullivan that caused either alleged incident," and thus has failed to state a claim.

Finally, Defendant argues he is entitled to qualified immunity. He asserts it was not clearly established in 2018 through 2019 that being "'aware of the ongoing excessive use of force incidents'" and acting in an "unspecified way to 'ratify' the supposedly unconstitutional conduct of his subordinates," would violate the constitution. He contends the "opposite was true." Thus, "[b]ecause no case law clearly established that every reasonable person would have known that Sullivan's alleged conduct was unconstitutional, Sullivan is entitled to qualified immunity."

1    Defendant asks this Court to dismiss the claim against him, with prejudice, because

2    Plaintiff cannot cure the factual deficiencies, making amendment futile.

3    **Plaintiff's Opposition (Doc. 49)**

4    Plaintiff contends the allegations set forth in the fourth amended complaint "do not merely

5    recite 'the elements of the claim,'" as Defendant argues. Rather, the allegations in paragraph 70

6    are sufficiently detailed because they contend Defendant "was required to review —and did

7    review—all of the materials specifically identified in the paragraph as part of his job

8    responsibilities and duties as warden at CCI," including "the July 2018 OIG Report" detailed in

9    paragraph 71. Plaintiff asserts "[i]t is incredulous to argue that" Defendant did not read those

10   materials or that "he was somehow unaware of their existence or contents." Moreover, he argues

11   paragraph 71, as it concerns Defendant's failure "to adequately embrace the training modules"

12   and his failure to "curtail the pervasive beating incidents" is sufficiently detailed.

13   Next, Plaintiff maintains that Defendant's argument that the July 2018 OIG Report and

14   the "numerous 602's and grievances" filed do not equate to the facts in *Starr v. Baca* is erroneous.

15   He contends the OIG report and grievances "underscores the fact that" Defendant "knew of the

16   widespread abuses and excessive force incident at CCI" and "knew that as warden he had a duty

17   to address the issues." Plaintiff then asks whether it is Defendant's position that he did not read

18   the reports and grievances, whether he did not believe that "widespread beatings and violent acts

19   of excessive for were rampant at his prison," or whether he acknowledges or claims he did not

20   read "such OIG Reports, 602's or inmate grievances, or that his job duties [do] not require him to

21   do so?"

22   Plaintiff asserts he has sufficiently alleged Defendant's "culpability as he has

23   demonstrated" his deliberate indifference to Plaintiff's safety and well-being," in accordance with

24   *Iqbal* and *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018), in paragraphs 70 and 71 of the fourth

25   amended complaint. Those paragraphs "added detail of Sullivan's actual knowledge or at the

26   least, his constructive knowledge, of the many instances of excessive force at CCI and that his

27   correctional officers at CCI were out of control." Plaintiff argues Defendant's "callous disregard

28   and indifference to the safety and well-being of the CCI inmates" was shown by Defendant's

1    inaction and his intentional failure to take corrective measures.

2         As concerns Plaintiff's identification of Defendant Harris having been "previously

3    subjected to several instances of complaints and discipline," Plaintiff asserts his "allegations

4    demonstrate that the 'requisite causal connection [was] established … by setting in motion a

5    series of acts" or by Defendant's knowing refusal to terminate a series of acts by others, "which

6    [the supervisor] knew or reasonably should have known would cause others to inflict a

7    constitutional injury," citing to *Starr*. Plaintiff contends "'even one allegation of a harmful act'"

8    entitles him to "'go forward with his claim,'" citing to *Pelletier v. Federal Home Loan Bank of*

9    *San Francisco*, 968 F.2d 865 (9th Cir. 1992). Plaintiff asserts "[e]very single attack by a CCI

10   correctional officer upon a housed inmate is required to be reviewed at the warden's desk, and

11   properly documented in the facility's files." He contends he has properly alleged Defendant's

12   duties as warden "was to oversee, read and be aware of such reports, including the respective 602

13   administrative complaints brought by CCI inmates against these C.O.'s, of which there were

14   many at CCI prior to July 29, 2019, as contained in the July 2018 OIG Report."

15        Plaintiff contends that pursuant to *Starr*, he "is only required to demonstrate a causal

16   connection" that Defendant "'reasonably should have known (reporting of the December 18, 2018

17   attack on [Plaintiff] by F. Harris and V. Mansferrer) would cause others (i.e., J. Munoz and B.

18   Carillo) ***not*** to inflict a constitutional injury of the alleged attack on Plaintiff, or that they were

19   involved in it.'" (Emphasis in original.) Plaintiff states he did not plead "'advance knowledge' of

20   the subsequent July 29, 2019 assault" by Defendant Munoz and Carillo, and condoned or

21   witnessed by Defendant Escarcega" because that "is what discovery is for."

22        Plaintiff asserts his fourth amended complaint "does not contain the 'bald' and

23   'conclusory' allegations in *Iqbal*, but rather resembles the more detailed factual allegations in

24   *Starr*." Plaintiff contends Defendant's "feigned ignorance or simple lack of actual knowledge

25   should also not insulate him from the unconstitutional activities of his C.O. subordinates of which

26   he was —or should have been—acutely aware." He avers he has pled with sufficient particularity

27   Defendant's awareness and knowledge of Plaintiff's "previous, unprovoked attacks on December

28   31, 2018 —***a constitutional injury***—and that it would be reasonably foreseeable" that Plaintiff

would "again be brutally beaten." (Emphasis in original.) Moreover, he asserts Defendant was "also aware, specifically, of Defendant F. Harris' propensity and history of violent beatings and excessive force against CCI inmates and more constitutional injuries which were detailed in the July 2018 OIG Report and the numerous 602's and similar grievances which he read as part of his job responsibilities as CCI warden." (Emphasis omitted.)

Finally, Plaintiff contends Defendant is not entitled to qualified immunity. Plaintiff contends the cases cited by Defendant concern summary judgment or trial, rather than cases decided at the pleadings stage. He asserts that to consider "these unrelatable distinguishable cases" as against the allegations asserted here "is illogical, improper, and prejudicial." Plaintiff maintains he has sufficiently alleged deliberate indifference or callous or reckless indifference by Defendant with detailed allegations that must be taken as true for purposes of Defendant's motion and that Defendant has "sufficiently been put on notice as to those claims asserted against him." The allegations are satisfactory "and if and when internal documents of CCI are produced properly, these allegations will be supplemented and expanded, accordingly."

**Defendant's Reply (Doc. 50)**

In reply to Plaintiff's opposition, Defendant repeats his argument that Plaintiff's assertions in the fourth amended complaint do "not specifically identify any incident, when the incident happened, when Sullivan knew about it, or what his response was." Defendant again states the 2018 OIG report did not include any CCI-specific findings of inmate abuse or excessive force.

Defendant contends Plaintiff's argument in opposition— that because Defendant was "required to review the 'multitude' of documents," he reasonably should have known that his conduct would cause others to inflict a constitutional harm—fails to specifically identify any incident, when the incident happened, when Defendant knew about it, or what his response was. Further, "for the most part, the [fourth amended complaint] fails to identify the content of the documents, and where [it] does address the content of the OIG report, that content does not support" Plaintiff's conclusion that Defendant knew of "'widespread beatings' or systemic use of force at CCI." Defendant contends that "[p]ointing to a 'multitude' of unidentified documents and concluding that Defendant must have known of systemic abuses by officers from their

1    (unidentified) content does not change the conclusory nature" of Plaintiff's allegations.

2            Defendant takes issue with Plaintiff's assertion that his fourth amended complaint is

3    "analogous to the complaint in *Starr v. Baca*" because "the complaint in *Starr* pled plentiful facts

4    to support a finding that the sheriff there knew of a pattern and practice of constitutional

5    violations by sheriff's deputies." It discussed a "findings letter," a memorandum of understanding

6    with the Department of Justice, and other reports concerning inmate abuse and increasing levels

7    of violence. Defendant asserts Plaintiff's fourth amended complaint "pleads only conclusions"

8    whereas "the complaint in *Starr* pled facts."

9            Next, Defendant contends Plaintiff's fourth amended complaint "simply concludes,

10   without any factual support that Harris had a 'propensity' to violate policy" of which Defendant

11   was aware. He argues the fourth amended complaint "says nothing about Sullivan's conduct,

12   instead [it is] simply speculating that Sullivan must be at fault because he was the warden."

13           Defendant repeats his contention that Plaintiff's allegations regarding MILO training do

14   not support a finding of supervisory liability because the "assertion that Sullivan 'failed to

15   adequately embrace' MILO's training modules is simply a vague, legally meaningless conclusion

16   without any factual support" and that Plaintiff "provided no argument beyond restating the

17   language" used in the fourth amended complaint such that "Sullivan's point stands" in the

18   absence of meaningful opposition.

19           Next, Defendant contends Plaintiff's fourth amended complaint does not allege Defendant

20   was aware of a December 2018 incident involving Plaintiff. Defendant asserts "this new

21   allegation cannot be considered on this motion to dismiss." Additionally, even had it been

22   properly alleged, Defendant argues personal liability cannot be imposed on a supervisor based on

23   a single prior act of misconduct by subordinates. As concerns Plaintiff's argument that "'even one

24   allegation of harmful conduct,'" citing to *Pelletier*, allows Plaintiff to proceed, Defendant asserts

25   the Ninth Circuit "was not discussing the standard for individual supervisory liability for state

26   officials, but rather liability for federal officials generally on a *Bivens* claim." Defendant

27   maintains *Pelletier* does not apply and that Plaintiff failed to plead facts showing Defendant

28   ignored a pattern or practice of misconduct. Thus, Defendant contends Plaintiff still fails to state a

1    claim on this basis.

2        Finally, Defendant contends he is entitled to qualified immunity as previously asserted,

3    and that the Supreme Court has directed courts to resolve the issue "'at the earliest stage of

4    litigation possible.'" Defendant notes the Ninth Circuit has held that district courts "'may grant a

5    motion to dismiss on qualified immunity grounds if the record supports such a ruling.'"

6    Defendant avers that "accepting any non-conclusory factual allegations as true," Plaintiff's fourth

7    amended complaint "shows on its face that qualified immunity applies," and thus there is no

8    reason to delay a ruling.

9                    **A.  Plaintiff Has Not Plausibly Alleged an Eighth Amendment Claim**

10       Because the fourth amended complaint does not assert Defendant Sullivan was personally

11   involved in the constitutional violation at issue, Plaintiff must allege a sufficient causal

12   connection between Sullivan's wrongful conduct and the constitutional violation.

13       A supervisor may be held liable under section 1983 "if there exists either (1) his or her

14   personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

15   between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at

16   1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). To be liable, the supervisor's

17   participation could include his "own culpable action or inaction in the training, supervision, or

18   control of his subordinates, his acquiescence in the constitutional deprivations of which the

19   complaint is made, or conduct that showed a reckless or callous indifference to the rights of

20   others." *Id.* at 1205-06 (citing *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991)). Thus,

21   to hold Defendant Sullivan liable under a deliberate indifference theory, Plaintiff is required to

22   allege Sullivan had knowledge of and acquiesced to the conduct of subordinate officers. *Hydrick*

23   *v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012).

24   //

25   //

26   //

27   //

28   //

1

**1.  Policies, Practices and Customs**[2]

2       Plaintiff's fourth amended complaint asserts Defendant Sullivan maintained and permitted

3  "the practices, policies and customs under CDCR guidelines and procedures for correctional

4  facilities." (Doc. 46 at 18.) Plaintiff alleges, on information and belief, that Sullivan "as the

5  official policy maker for CCI Tehachapi, was aware of widespread beatings and use of excessive

6  force in CCI Tehachapi." (*Id*.) On information and belief, Plaintiff asserts Sullivan had "actual

7  notice of the widespread beatings at CCI through several sources" and that he "was CCI's hiring

8  authority who is required to impose discipline on those correctional officers that served below

9  him." (*Id*.) Plaintiff further contends Sullivan "was required to review, and did review, a

10  multitude of inmate incident documentation related to abuses against and the use of excessive

11  force," including "inmate incident reports, 602 grievances, use of force reviews and reports under

12  Title 15, medical reports, emergency room data, Office of Internal Affairs investigations into

13  CDCR personnel misconduct, and OIG reports." (*Id*. at 18-19.) Plaintiff alleges Sullivan was

14  "keenly aware of the systemic abuse and violence of his subordinate officers at CCI because the

15  July 2018 OIG Report entitled 'Monitoring the Use of Force,' made it abundantly clear that those

16  systematic abuses of inmates by the CCI correctional officers and assaults against inmates at that

17  facility remained widespread, continuous and sometimes deadly." (*Id*. at 18-19.) Plaintiff

18  contends that "[i]nstead of taking proper steps to discipline Individual Defendants and named Doe

19  Defendants, Defendant Sullivan condoned, encouraged, fostered and/or ratified the unlawful

20  conduct of said Defendants." (*Id*. at 20.) Plaintiff further asserts that, on information and belief,

21  Sullivan "ratified the Individual Defendants and Doe Defendants' unconstitutional conduct

22  towards Plaintiff." (*Id*. at 20.) Additionally, Plaintiff contends Sullivan "was particularly

23  knowledgeable and aware of Defendant F. Harris' propensity to violate CDCR departmental

24  policy due to Harris' involvement in several excessive [use] of force incidents which results in

25  _____

26  [2] The Court reviewed the California Office of the Inspector General's Monitoring the Use of Force report dated July 2018. (*See* <https://www.oig.ca.gov/wp-content/uploads/2019/05/OIG_Report_-_Monitoring_the_Use_of_Force_2017-2.pdf> [last accessed 9/20/2023].) *See Daniels-Hall v.*

27  *Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010) (a court may take judicial notice of "information [that] was made publicly available by government entities" where "neither party disputes the authenticity ... or the accuracy of the information").

28

1    significant injuries to inmates and legal and financial repercussions to the State of California.

2    Defendant Sullivan's inaction allowed Harris to act with impunity." (*Id*.) Plaintiff asserts Sullivan

3    failed to take reasonable steps to protect Plaintiff and to ensure his right to be free from cruel and

4    unusual punishment. (*Id*. at 21.)

5         Plaintiff's assertion that his "claims against Defendant Sullivan are based on his

6    maintaining and permitting practices, policies and customs under CDCR guidelines and

7    procedures for correctional facilities" is conclusory. Plaintiff does not identify any specific

8    practice, policy or custom. *See Hydrick*, 669 F.3d at 942 ("Plaintiffs' complaint is based on

9    conclusory allegations and generalities, … there is no allegation of a *specific* policy implemented

10   by the Defendants or a *specific* event or events instigated by the Defendants that led to these

11   purportedly unconstitutional searches") (emphasis in original). *See also Keates v. Koile*, 883 F.3d

12   1228, 1242-43 (9th Cir. 2018) (conclusory allegations that defendant promulgated

13   unconstitutional policies and procedures which authorized the conduct at issue and caused the

14   allegedly unconstitutional conduct insufficient for § 1983 liability).

15        In *Keates*, the Court found plaintiff's complaint did not allege that defendant Carter was

16   directly involved in the allegedly unconstitutional conduct or that he had knowledge of the

17   constitutional deprivations and acquiesced in them. Rather, the complaint made "conclusory

18   allegations that Carter promulgated unconstitutional polic[i]es and procedures which authorized

19   the particular conduct in this case and directly caused [named defendant] Kolie's allegedly

20   unconstitutional conduct. These allegations do not suffice to state a claim for supervisor liability."

21   *Keates*, 883 F.3d at 1243. Here, while Plaintiff has alleged more facts than previously asserted,

22   the Court finds that like *Keates*, these allegations are insufficient to raise a right to relief above

23   the speculative level. *Twombly*, 550 U.S. at 555.

24        Plaintiff alleges Sullivan is "the official policymaker for CCI" and "was aware of

25   widespread beatings and use of excessive force in CCI." (Doc. 46 at 18.) He contends that

26   Sullivan had actual notice "through several sources" because Sullivan "was CCI's hiring

27   authority who is required to impose discipline on those correctional officers that serve below

28   him" and that Sullivan is "required to review, and did review, a multitude of inmate incident

1  documentation," including incident reports, grievances, use of force reviews and report, medical

2  reports and emergency room data, and OIA and OIG reports. (*Id.* at 18-19.)

3        While the July 2018 OIG Report includes information not previously asserted, a

4  distinction exists between the report's "use of force" language and Plaintiff's terminology,

5  including his assertions that Sullivan had knowledge of "systemic abuse" "widespread beatings"

6  and "excessive force." In other words, while the July 2018 OIG Report documents the use of

7  force in CDCR facilities occurring during the relevant time period, the "use of force" findings in

8  the report do not equate to findings of "excessive force," "widespread beatings" or "systemic

9  abuse" as used by Plaintiff. The use of force can occur without excessive and unnecessary force,

10  "widespread beatings" or "systemic abuse." The report itself references its "use of terms and

11  concepts specific to the use of force," including "reasonable force," "unnecessary force," and

12  "immediate use of force." (*See* July 2018 OIG Report at 11<https://www.oig.ca.gov/wp-

13  content/uploads/2019/05/OIG_Report_-_Monitoring_the_Use_of_Force_2017-2.pdf> [last

14  accessed 10/12/2023].)

15        The Court agrees with Defendant that the July 2018 OIG Report, coupled with Plaintiff's

16  even more general assertions concerning Sullivan's review of grievances and numerous other

17  reports, are not sufficiently specific. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. *See, e.g.,*

18  *Windham v. Franklin*, No. CV 13-3004-SVW (JEM), 2014 WL 7740262, at *14 (C.D. Cal. Aug.

19  29, 2014) (plaintiff's conclusory allegations that associate wardens "knew that prison officials

20  used excessive force against inmates" and "knew of the 'systemic acts of excessive force on

21  inmates' by the Green Wall prison officials and condoned them" insufficient to state a claim),

22  adopted by 2015 WL 500500 (C.D. Cal. Feb. 2, 2015); *Himes v. Gatelo*, No. 2:18-cv-00327-PSG

23  (MAA), 2020 WL 2089162, at *8 (C.D. Cal. Mar. 9, 2020) (allegation that defendant "directs the

24  practices and policies of subordinate employees," "personally knew of the violations," and

25  "refus[ed] to enforce rules and policies" found "not sufficient to state a claim of supervisory

26  liability"), adopted by 2020 WL 2079980 (C.D. Cal. Apr. 29, 2020). Rather, the allegations in the

27  fourth amended complaint merely create a suspicion of a legally cognizable right of action.

28  *Twombly*, 550 U.S. at 555.

Plaintiff's allegations in the fourth amended complaint are not as robust as those asserted against Baca in *Starr*. In *Starr*, the plaintiff alleged Baca knew or should have known inmates under his care were in danger based upon a United States Department of Justice ("DOJ") "'findings letter' of a continued and serious pattern and practices of constitutional violations,'" weekly subordinate reports, receipt of "'ongoing reports of his Special Counsel and Office of Independent Review,'" a Memorandum of Understanding with the DOJ "to address and correct the continuous constitutional violations to which inmates were being subjected," specific knowledge concerning approximately nine incidents allegedly involving inmates identified as having been assaulted or killed while incarcerated, and notices and findings from The Special Counsel to the Los Angeles County Sheriff's Department. *Starr*, 652 F.3d at 1209-1212. Thus, while the allegations set forth in Plaintiff's fourth amended complaint assert additional facts as compared to the previous operative complaint, the Court finds those facts are not sufficiently specific to causally connect Defendant Sullivan's actions or inactions to the constitutional harm suffered by Plaintiff. *Hydrick*, 669 F.3d at 942; *Fayle*, 607 F.2d at 862; *Taylor*, 880 F.2d at 1045.

## 2. Supervision, Training and Hiring

"A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (internal alteration & quotation marks omitted).

Plaintiff's fourth amended complaint alleges Defendant Sullivan "failed to adequately train custody staff in the appropriate use of force and criminal activity." (Doc. 46 at 17-18.) He alleges Sullivan is "responsible for the supervision, training and hiring of persons and employees working within CCI Tehachapi including correctional officers, medical staff, mental health staff and other employees within the CCI facility." (*Id*. at 18.) Referring to the July 2018 OIG Report, Plaintiff alleges that in July 2017, "CDCR implemented its officer training program for correctional officers and staff known as multiple interactive learning objective (MILO) simulator designed to educate and train officers to counter the escalating occurrences of abuse and

1    excessive force against inmates, deployed with mixed results." (*Id*. at 19.) Specifically, Plaintiff

2    alleges Sullivan "was aware of the increasing dangers his officers posed to the CCI inmates" and

3    "failed to adequately embrace the training modules and took no steps to curtail the pervasive

4    beating incidents, up to at least December 31, 2018, then again on July 29, 2019, when Plaintiff

5    was senselessly beaten by the named Individual Defendants herein." (*Id*. at 19-20.)

6         Here, even liberally construing the fourth amended complaint and resolving doubts in

7    Plaintiff's favor, the Court finds the allegations against Defendant Sullivan concerning training

8    are not sufficiently specific. While Plaintiff has identified a specific training program—MILO—

9    and has generally alleged deficiencies in the implementation of that program at CCI to Sullivan,

10   Plaintiff does not identify any deficiencies or explain how Sullivan's implementation of MILO at

11   CCI was deficient. The specific allegation that Sullivan "failed to adequately embrace" the MILO

12   training modules does not identify what Sullivan purportedly "failed to adequately embrace" or

13   what action he failed to take.[3] Nor has Plaintiff connected any purported failure to his assertion

---

14   [3] The Court notes the July 2018 OIG Report states, in part:

15
16        In July 2017, … the department deployed the multiple interactive learning
          objective (MILO) simulator. All custodial and noncustodial staff use this
17        training to improve their communication skills and learn when to apply de-
          escalation techniques. The goal is to gain voluntary compliance through
18        verbal persuasion rather than by force. In additional, the training assists
          staff in learning to recognize signs and symptoms of mental illness or
19        developmental disability. [¶] MILO training consists of numerous prison-
          based, interactive scenarios conducted by certified instructors who direct
20        the scenario based on the participant's verbal interaction with it, which is
          projected on a 12-foot screen. The scenarios do not initially present the
21        participant with an imminent threat. However, depending on the
          participant's ability to employ de-escalation techniques, the scenario may
22        present a threat that required the participant to deploy a use of force. [¶]
          MILO training has been implemented statewide and is now included in the
23        department's required annual use-of-force training. The OIG has observed
          the MILO simulator at several institutions, and our staff were encouraged
24        by both the instructional level and participant interaction. Following each
          scenario, meaningful discussion occurred between the participants and
          instructors, which included both custodial and mental health staff."
25
     (*See* page 13 < https://www.oig.ca.gov/wp-content/uploads/2019/05/OIG_Report_-
26   _Monitoring_the_Use_of_Force_2017-2.pdf> [last accessed 10/12/2023].) It also states:
     "To evaluate the implementation of statewide de-escalation training, inspectors observed
27   the MILO simulator at several institutions. The OIG was impressed with the techniques
     offered as part of this training simulator and was pleased with the level of participation from
28   departmental staff" (*id*. at 21) and "We are also pleased with the department's use of the
     MILO training to improve correctional officers' communication skills and de-escalation

that Sullivan "took no steps to curtail the pervasive beating incidents ...." In this regard, Plaintiff's failure-to-train assertions regarding Sullivan are not sufficiently specific. *Fayle*, 607 F.2d at 862.

### 3. The Facts Referencing Defendant Harris

In the fourth amended complaint, Plaintiff contends Defendant Sullivan "was particularly knowledgeable and aware of Defendant F. Harris' propensity to violate CDCR departmental policy due to Harris' involvement in several excessive sue [sic] of force incidents ...." (Doc. 46 at 20.) However, Plaintiff has failed to allege with sufficient particularly how Sullivan "was particularly knowledgeable and aware" of Harris' purported propensity to violate policy. Plaintiff offers no specific information concerning Harris "involvement in several" excessive force actions allegedly resulting in significant injuries to those involved and "financial repercussions to the State of California." He offers no case names or numbers, identifies no other inmates purportedly involved, offers no factual background or comparisons, or the specific findings by any court. *See, e.g.*, *Samaniego v. CDCR*, No. 1:21-cv-00839-JLT-CDB, 2023 WL 2278267, at *10 (E.D. Cal. Feb. 28, 2023) ("Samaniego does not identify other specific incidents in which a prisoner submitted a 602 claim and suffered retaliatory actions by Harris or the other named defendants as a result, such that Sullivan would be aware of a pending threat to Samaniego").

### 4. Conclusion

To conclude, this Court finds, even liberally construed and resolving doubt in Plaintiff's favor, the fourth amended complaint fails to sufficiently allege a claim against Defendant Sullivan. The facts are insufficient to support a causal connection between Sullivan and Plaintiff's constitutional claims. *Starr*, 652 F.3d at 1205-07. Therefore, this Court will recommend Defendant Sullivan's motion to be dismiss be granted.

Further, when dismissing a claim, "a district court should grant leave to amend ... unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Here, Plaintiff has previously been granted leave to amend his claims against Defendant Sullivan to add specificity. (*See* Docs. 25 at 5-6 & Doc. 45.)

---

techniques as a means of curtailing use-of-force incidents" (*id.* at 39).

In this final attempt, Plaintiff has again failed to allege facts sufficient to state a plausible claim against Defendant Sullivan. Thus, the Court finds granting further leave to amend the claims against Sullivan would be futile. *Hartmann v. CDCR*, 707 F.3d 1114, 1130 (9th Cir. 2013).

### B.  Qualified Immunity

Defendant contends he is entitled to qualified immunity. However, because the Court is recommending Defendant Sullivan's motion to dismiss be granted, it need not reach and does not address Defendant's argument concerning qualified immunity.

### V.   CONCLUSION AND RECOMMENDATIONS

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that Defendant Sullivan's motion to dismiss the fourth amended complaint (Doc. 48) be **GRANTED** without leave to amend, and that Defendant Sullivan be dismissed from this action.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within 14 days** of the date of service of these Findings and Recommendations, Plaintiff may file written objections with the Court. The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff's failure to file objections within the specified time may result in waiver of his rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 17, 2023**

_____
UNITED STATES MAGISTRATE JUDGE